## 02UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DAVID MARX** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-0128** |
| **DARREL VANNOY** | **SECTION "M"(4)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).[1]

## I.   Factual and Procedural Background

The petitioner, David Marx ("Marx"), is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  On October 20, 2011, Marx was indicted by an Orleans Parish Grand Jury for the second degree murder of his wife and for obstruction of justice.[3]  He pleaded not guilty to the charges on November 2, 2011.[4]  The State eventually severed and entered a *nolle prosequi* for the obstruction of justice charge.[5]

---

[1]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 1, p.1.

[3]St. Rec. Vol. 1 of 12, Indictment, 10/20/11; Docket Entry, 10/20/11.

[4]St. Rec. Vol. 1 of 12, Minute Entry, 11/2/11.

[5]St. Rec. Vol. 1 of 12, Trial Minutes, 12/2/13; Indictment, handwritten amendment, 3/12/14; St. Rec. Vol. 2 of 12, Notice/Motion to Sever, 12/2/13.

The record reflects that in May of 2011, Marx was a Chief Petty Officer in the U.S. Navy who had been stationed in Norfolk, Virginia for a number of years.[6] His wife Mary and their son I.M. remained living in the Marx's residence at 717 Nunez Street in the Algiers Point neighborhood of New Orleans. On the evening of May 25, 2011, Tina Brown, the Marx's neighbor, returned home from work about 5:30 p.m. and was approached by a military police officer who asked if she could go get I.M. from his school on the grounds of the nearby Navy base. When Brown and I.M. returned to the Marx's home, I.M. walked to the side of the residence and screamed hysterically when he saw through a window that his mother was lying dead on the floor. Brown broke through the door and called 911. Mary Marx had been shot by two bolts or arrows from a crossbow. One arrow entered her chest, pierced a lung, and severed her spine. The second arrow entered the center of her face at the side of her nose, pierced through her skull and brain, and partially exited out the back of her head.

Brown also tried to contact Marx several times but was unsuccessful. The next evening, Marx told Brown that he was having phone trouble when he missed her messages and by that time, he already had spoken to Detective Barrett Morton of the New Orleans Police Department ("NOPD") and was aware of his wife's death.

The investigation following the murder was conducted by both the NOPD and Naval Criminal Investigative Service ("NCIS") in Norfolk, Virginia. The NOPD and NCIS officers also initially were unable to locate or contact Marx, whose two cell phones were allegedly turned off. The NCIS agents discovered that Marx was on leave in Pensacola, Florida, from May 13, 2011

---

[6]The facts were taken from the published opinion of the Louisiana Fourth Circuit Court of Appeal on direct appeal. *State v. Marx*, 163 So.3d 44, 46-54 (La. App. 4th Cir. 2015); St. Rec. Vol. 5 of 12, 4th Cir. Opinion, 2014-KA-0332, pp. 1-16, 3/4/15.

with a report back date of May 27, 2011.  He did not return the NOPD officers' calls until after 7:00 p.m. the day after Mary's body was found.

The NOPD investigation revealed that, around 7:00 a.m. on May 24, 2011, Terry Barrett was trimming a tree in front of his residence on Slidell Street in Algiers Point.  He noticed a man park a white Ford Escape with Texas plates on the corner of Slidell and Teche Streets.  The next morning, May 25, 2011, Barrett again noticed the same car parked at the same corner.  Around 9:00 a.m., Barrett saw the same man from the previous day walk from around the corner of Nunez Street to the car, get in, and drive off.  Later that night, Barrett saw that a crowd had gathered on Nunez Street after the murder was discovered.  He and another neighbor, Arthur Sangacruze, eventually spoke to police about the man and car they both saw in the area.  Barrett and Sangacruze also separately identified a photograph of the man they saw, and it was a photograph of Marx.

After this, NCIS officers conducted surveillance of Marx and coordinated with the Virginia Beach Police Department SWAT team to detain Marx outside of his Virginia Beach apartment, which he shared with his girlfriend, Michele Conry.  After detaining Marx and Conry, the officers conducted searches of Marx's apartment and his car, which was white Ford Escape with Texas plates.  The officers located a box for a crossbow scope under the front passenger seat of his car and other items related to the purchase of a cross-bow.  NOPD obtained an arrest warrant and on May 27, 2011, the officers in Virginia arrested Marx.  Marx was interviewed by NCIS agents during which he indicated concern for his son but denied involvement in his wife's murder.  He told officers that he drove from Pensacola to New Orleans to reminisce but did not see his family.

The officers in Virginia also interviewed Conry, who met Marx in February of 2010 and lived with him in the Virginia Beach apartment.  In May of 2011, she traveled with him to Pensacola, Florida, for a vacation.  During that trip, Marx left several times during the night

without explanation.  She confirmed that he was not at the hotel when she awoke around 1:00 a.m. on May 25, 2011.  He still had not returned when Conry awoke again around 9:00 a.m.  She recalled that he did not return that morning until about 11:30 a.m.  They left Pensacola the next day, May 26, 2011, around 5:00 p.m. to return to Virginia.

On May 28, 2011, the day after Marx's arrest and statement to NCIS, NOPD Detective Morton traveled to Virginia Beach and obtained a recorded statement from Marx.  Detective Morton advised Marx of his rights and had him complete a NOPD waiver of rights form.  According to Detective Morton, Marx was forthcoming and concerned about son's well-being.  Marx's discussion about I.M.'s care "escalated" into Marx's confession to his wife's murder.

In the recorded statement, Marx stated that it was still dark when he parked on a side street, grabbed his crossbow, proceeded to their family home, and crawled underneath it.  He watched his wife leave to bring I.M. to school in the morning, and with his cross-bow in a bag, he entered the house through the back door using his key.  When he observed the condition of the house and checked on the medication his wife was giving their son, he became enraged.  When his wife returned home, Marx shot her with an arrow in her upper right shoulder.  She was still moving after she fell to the floor, so Marx shot her in the face with the second arrow.  Marx left through the back door and returned to his car.  He drove back to meet Conry in Florida to continue their vacation.  On the way, he broke up the crossbow and discarded the pieces in multiple dumpsters.

Marx told Detective Morton that he was angry and wanted to save his son from Mary's abusive care.  The defendant said he searched to purchase the crossbow and found one to buy from a private person in Richmond, Virginia.  He admitted, however, that when he was headed to Florida he was thinking about going to New Orleans to kill Mary.  He also told the detective that he did not bring his cell phones to New Orleans because he just wanted to get the job done.

Marx was tried before a jury on December 2 through 5, 2013, and found guilty as charged of second degree murder.[7]  At a December 10, 2013, hearing, the state trial court denied Marx's motions to reopen the previously denied motion to suppress his statements to Detective Morton and for new trial.[8]  At the same hearing, the Court sentenced Marx to serve life in prison without benefit of parole, probation, or suspension of sentence.[9]

On direct appeal to the Louisiana Fourth Circuit Court of Appeal, Marx's retained counsel asserted the following errors:[10]  (1) the state trial court erred when it denied the motion to reopen the motion to suppress Marx's statement; (2) the state trial court erred when it denied the motion for new trial; (3) the state trial court erred when it denied the motion to suppress the statement; and (4) the verdict was contrary to the law and evidence.

In his multiple pro se supplemental briefs, Marx asserted the following grounds for relief:[11] (1) the evidence was insufficient because of the lack of DNA evidence; (2) his trial appellate counsel were ineffective because they (a) failed to assert the denial of his right against self-incrimination when he requested counsel during his statement to police and (b) did not adequately address the lack of DNA evidence as a basis to challenge the conviction; (3) the State failed to negate the possibility of misidentification by the witnesses; (4) he was not read his *Miranda* rights

---

[7]St. Rec. Vol. 1 of 12, Trial Minutes (2 pages), 12/2/13; Trial Minutes (2 pages), 12/3/13; Trial Minutes, 12/4/13; Trial Minutes (3 pages), 12/5/13; St. Rec. Vol. 4 of 12, Trial Transcript, 12/2/13; Trial Transcript, 12/3/12; St. Rec. Vol. 5 of 12, Trial Transcript, 12/4/13; Trial Transcript, 12/5/13.

[8]St. Rec. Vol. 1 of 12, Sentencing Minutes, 12/10/13; St. Rec. Vol. 2 of 12, Motion to Reconsider, 12/10/13; Trial Court Order, 12/10/13; St. Rec. Vol. 5 of 12, Sentencing Transcript, 12/10/13.

[9]St. Rec. Vol. 1 of 12, Sentencing Minutes, 12/10/13; St. Rec. Vol. 5 of 12, Sentencing Transcript, 12/10/13.

[10]St. Rec. Vol. 5 of 12, Appeal Brief, 2014-KA-0332, 11/14/14.

[11]St. Rec. Vol. 5 of 12, Pro Se Supplemental Appeal Brief, 2014-KA-0332, 10/31/14 (dated 9/23/14); Supplement to Supplemental Brief, 2014-KA-0332, 11/12/14 (dated 11/4/14); Pro Se Supplemental Brief, 2014-KA-0332, 12/2/14; *see*, *Marx*, 163 So.3d at 58-60; St. Rec. Vol. 5 of 12, 4th Cir. Opinion, 2014-KA-0332, pp. 23-27, 3/4/15.

before his arrest in Virginia Beach, there was no proof that he waived those rights, and he was denied counsel despite his request.

On March 4, 2015, the Louisiana Fourth Circuit affirmed Marx's conviction and sentence finding no merit in the claims asserted.[12]  On April 2, 2015, Marx's retained appellate counsel filed a writ application in the Louisiana Supreme Court seeking review of the denial of relief on the four counsel-filed errors from the direct appeal.[13]  The Court denied the application on March 24, 2016, without stated reasons.[14]

Marx's conviction and sentence became final 90 days later, on June 22, 2016, because he did not file for review with the United States Supreme Court.  *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for *certiorari* with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. S. Ct. Rule 13(1).

In the meantime, on November 12, 2015, Marx signed and submitted a pro se writ application to the Louisiana Supreme Court seeking review of his pro se appellate claims.[15]  On March 14, 2016, the Court declined to consider the application finding it untimely filed under La. S. Ct. Rule X.[16]  On April 15, 2016, the Court also denied the request for reconsideration filed on Marx's behalf by his new counsel.[17]

Between October of 2016 and January 20, 2017, Marx through different post-conviction counsel submitted motions for the release of trial evidence and for certain parts of the trial

---

[12]*Marx*, 163 So.3d at 44; St. Rec. Vol. 5 of 12, 4th Cir. Opinion, 2014-KA-0332, 3/4/15.

[13]St. Rec. Vol. 8 of 12, La. S. Ct. Writ Application, 15-K-643, 4/2/15.

[14]*State v. Marx*, 190 So.3d 1195 (La. 2016); St. Rec. Vol. 8 of 12, La. S. Ct. Order, 2015-K-0643, 3/24/16.

[15]St. Rec. Vol. 9 of 12, La. S. Ct. Writ Application, 15-KH-856, 4/17/15 (dated 4/12/15).

[16]*State ex rel. Marx v. State*, 188 So.3d 1064 (La. 2016); St. Rec. Vol. 9 of 12, La. S. Ct. Order, 2015-KH-0856, 3/14/16.

[17]*State ex rel. v. Marx*, 191 So.3d 1034 (La. 2016); St. Rec. Vol. 9 of 12, La. S. Ct. Order, 2015-KH-856, 4/15/16; Motion for Rehearing, 2015-KH-856, dated 3/23/16.

transcript.[18]  At a hearing held January 27, 2017, the state trial court denied the evidence request and granted the transcript request, to the extent they were available, at Marx's expense.[19]

Marx's counsel sought review of the denial of the evidence request, and the Louisiana Fourth Circuit denied the writ application without stated reasons on March 29, 2017.[20]  The Louisiana Supreme Court also denied the counsel-filed writ application on January 9, 2018.[21]

While those matters were pending, on March 24, 2017, Marx's counsel filed an application for post-conviction relief with the state trial court asserting the following claims:[22] (1) Marx is actually innocent; (2) he was denied effective assistance of counsel when counsel (a) failed to investigate Marx's cognitive impairments, (b) failed to file and litigate a motion to suppress the prejudicial confession,[23] (c) failed to investigate the crime and defenses, (d) prejudiced Marx by allowing him to plead guilty,[24] and (e) failed to subject the State's case to a meaningful adversarial test; (3) he was denied effective assistance of appellate counsel when counsel failed to obtain all of the trial transcript; (4) newly discovered evidence indicates Marx suffers from a severe cognitive impairment, questioning his competency to stand trial, his decision to testify, and representations or lack of expressions of remorse; (5) newly discovered evidence indicates that the real killer left DNA at the crime scene; and (6) Marx offers a general claim under *Brady* should one exist.

---

[18]St. Rec. Vol. 1 of 12, Motion for Complete Transcript, file stamped 12/3/16 and 1/20/17; Motion for Release of Evidence, file stamped 11/22/16 and 1/20/17; Motion to Compel, 7/11/17; Docket Entry, 12/1/16; Docket Entry, 12/13/16; Docket Entry, 1/20/17; Minute Entry, 1/20/17; Minute Entry, 12/1/16.

[19]St. Rec. Vol. 1 of 12, Docket Entry, 1/27/17.

[20]St. Rec. Vol. 6 of 12, 4th Cir. Order, 2017-K-0254, 3/29/17; 4th Cir. Writ Application, 2017-K-0254, 3/17/17 (by counsel).

[21]St. Rec. Vol. 10 of 12, La. S. Ct. Order, 2017-OK-0704, 1/9/18; La. S. Ct. Writ Application, 17-OK-704, 4/28/17 (by counsel).

[22]St. Rec. Vol. 1 of 12, Initial Application for Post-Conviction Relief, 3/24/17 (by counsel).

[23]Counsel did not indicate or argue any grounds on which a motion to suppress should have been based.

[24]This was the basis for the claim despite the fact that Marx did not enter a guilty plea.

The counsel-filed application was accompanied by Marx's supplemental pro se application for post-conviction relief which was also signed and filed on March 24, 2017.[25]   Marx's supplemental arguments were offered in support of counsel-filed claims five and six, as numbered by Marx: (5) the State failed to extract and test his DNA; (6)(a) the state withheld evidence that he made two phone calls from his cell phone from Florida showing he could not have killed his wife in New Orleans that morning, failed to investigate a possible suspect, and failed to correct the misidentifications by the two eyewitnesses; (6)(b) the State failed to produce evidence that must be tested for DNA; (6)(c) the State withheld exculpatory DNA evidence and prints never tested.

At an evidentiary hearing held September 18, 2017, the state trial court orally denied relief finding each of the claims, and the supplemental arguments, meritless.[26]   In doing so, the state trial court commented on the professionalism and thoroughness of Marx's trial counsel team and that the overwhelming evidence of Marx's guilt, including his confession, supported the verdict.[27]   The Court also denied other on-going requests by Marx's counsel related to transcript copies.[28]

On January 23, 2018, Marx's counsel sought review in the Louisiana Fourth Circuit of the denial of the counsel-filed post-conviction claims.[29]   The Court denied the writ application without stated reasons on March 13, 2018.[30]   On February 25, 2019, the Louisiana Supreme Court refused

---

[25]St. Rec. Vol. 1 of 12, Supplemental *Pro Se* Application for Post-Conviction Relief, 3/24/17 (dated 3/24/17); Notice of Intent to Amend, 3/24/17.

[26]St. Rec. Vol. 1 of 12, Hearing Transcript, 9/18/17; Minute Entry, 9/18/17.

[27]*Id.* at 6, 7-8.

[28]*Id.*; *see*, St. Rec. Vol. 1 of 12, Docket Entry, 1/27/17 (granted copies, denied release of evidence); *see also*, St. Rec. Vol. 1 of 12, Motion for Complete Transcript, 12/3/16 & 1/20/17; Motion for Release of Evidence, 11/22/16 & 1/20/17; Motion to Compel, 7/11/17; Docket Entry, 12/1/16; Docket Entry, 12/13/16; Docket Entry, 1/20/17; Minute Entry, 1/20/17; Minute Entry, 12/1/16.

[29]St. Rec. Vol. 6 of 12, 4th Cir. Writ Application, 2018-K-0063, 1/23/18.  Counsel apparently obtained an extended return date from the Louisiana Fourth Circuit.  *See* St. Rec. Vol. 6 of 12, 4th Cir. Order, 2017-KM-0924, 11/16/17; 4th Cir. Motion, 2017-KM-0924, 11/13/17; 4th Cir. Order, 2017-KM-1026, 12/21/17; 4th Cir. Motion, 2017-KM-1026, 12/3/17; 4th Cir. Motion, 2018-KM-45, 1/16/18 (related order not in record).

[30]St. Rec. Vol. 6 of 12, 4th Cir. Order, 2018-K-0063, 3/13/18.

to consider the subsequent counsel-filed writ application finding it untimely filed under La. S. Ct. Rules X §5(a) and XLII §6(e).[31]

In the meantime, on October 24, 2017, Marx wrote the Louisiana Fourth Circuit seeking leave to supplement any writ application filed by his counsel related to denial of his earlier post-conviction application.[32]   The Court returned the unfiled pleadings to Marx, because the documents were incomplete and procedurally improper.[33]

On November 20, 2017, Marx signed and submitted a separate *pro se* writ application to the Louisiana Fourth Circuit in which he argued that he was denied due process in his prior post-conviction proceedings and complained of errors by his retained post-conviction counsel and the state trial court in that proceeding.[34]   Attached to the writ application were numerous exhibits, including a copy of a proposed application for post-conviction relief, in which Marx asserted the following (numbered as he presented them):[35] (1) he is actually innocent and the State denied him access to DNA evidence and the opportunity to litigate the issue; (2) he received ineffective assistance of counsel when trial counsel failed to challenge the arrest warrant which was based on misidentification by two eyewitnesses; (2)(a) his trial counsel failed to file a pretrial motion challenging the jury instructions; (2)(b) the search warrant for his apartment and property was not valid and he was never read his *Miranda* warnings; (2)(c) Detective Morton coerced and made promises to extort the confession, and then read the *Miranda* warnings and asked him to repeat the confession; (2)(d) trial counsel provided ineffective assistance when they failed to conduct pretrial

---

[31]St. Rec. Vol. 11 of 12, La. S. Ct. Order, 2018-KP-0585, 2/25/19; La. S. Ct. Writ Application, 18-KP-585, 4/13/18 (efiled by counsel 4/12/18).

[32]St. Rec. Vol. 7 of 12, Supplement to Counsel Filed Writ Application, dated 10/24/17.

[33]St. Rec. Vol. 7 of 12, 4th Cir. Letter to Marx, 10/31/17.

[34]St. Rec. Vol. 7 of 12, 4th Cir. Writ Application, 2018-K-64, dated 11/20/17; Dated Cover Letter, 11/20/17.

[35]St. Rec. Vol. 7 of 12, Proposed Application for Post-Conviction Relief, dated 11/20/17.

discovery, file a timely suppression motion, or conduct pretrial investigation of DNA and print evidence; (3) he was denied a trial transcript and has been unable to fully develop his appeal record; (4) his cognitive impairments contributed to his lack of awareness of his constitutional rights and was not formally given his *Miranda* warnings or a waiver of rights form; (4)(a) his trial counsel was ineffective when he failed to investigate Marx's autoimmune disorder which causes cognitive and emotional impairments, failed to hire or consult with a medical or mental health expert, or provide an explanation for his appearance while he testified; (5) newly discovered evidence that the State failed to test forensic evidence; (5)(a) the DNA evidence and latent prints were not forensically tested and the assistant district attorney stated in closing arguments that the State had oil from Marx's fingers from the scene; (5)(b) the State failed to take DNA from him at the time of his arrest in violation of Louisiana law; (6) the State failed to disclose exculpatory evidence when his cell phone records proved he was actually innocent because he made two phone calls from Florida, one of which was near the time of the murder, the State failed to investigate a possible suspect, and the two eyewitnesses that led to his arrest misidentified him; (6)(a) the State failed to disclose exculpatory evidence; (6)(b) the State's failure to disclose exculpatory evidence resulted in DNA, *Brady*, and *Bagley* violations; and (6)(c) the State's concealment of exculpatory evidence was DNA, *Brady*, and *Bagley* violations where the district attorney's file has been lost and contained exculpatory evidence that would exonerate Marx.

On March 13, 2018, the Louisiana Fourth Circuit granted Marx's writ application for the sole purpose of transferring the "proposed" post-conviction application to the state trial court for consideration.[36]   Over the next several months, the appellate court issued additional mandamus

---

[36]St. Rec. Vol. 7 of 12, 4th Cir. Order, 2018-K-0064, 3/13/18.

orders for the state trial court to take action on the transferred post-conviction application.[37]  In response to Marx's last inquiry, on August 21, 2018, the Louisiana Fourth Circuit determined that the state trial court had in fact denied the transferred post-conviction application on August 7, 2018, and therefore, denied Marx's mandamus request.[38]

Marx did not seek review of the state trial court's August 7, 2018, ruling.  Instead, on September 20, 2018, Marx filed a writ application with the Louisiana Supreme Court seeking review of the appellate court's mandamus orders which had extended time for the state trial court to act.[39]  Marx also requested that the Louisiana Supreme Court review the following five new post-conviction claims:[40] (1) the judgment and appeal were rendered on an incomplete trial record; (2) the State violated *Brady* and *Giglio* when it withheld DNA evidence and presented false and perjured evidence to the grand and petit juries that the DNA evidence identified Marx when no DNA testing was done; (3) the state trial court erred and should have been recused for allowing the State to prosecute Marx on an incomplete record despite the lack of DNA testing and blocking Marx's access to forensic evidence; (4) his post-conviction claims have not been reviewed or answered by the district attorney; and (5) he was denied due process when false DNA test results and misidentification by two eyewitness were presented to the grand and petit juries.

On October 15, 2019, the Louisiana Supreme Court denied Marx's writ application stating that Marx "shows no lower court error."[41]

---

[37]St. Rec. Vol. 7 of 12, Letter to the 4th. Cir., 2018-K-0693, 9/24/18 (received by and efiled from prison 9/24/18); Inquiry Letter, 2018-K-0693, 8/14/18 (received by and efiled from prison 8/10/18); Inquiry Letter, 2018-K-0546, 8/14/18 (received by and efiled from prison 8/10/18); 4th Cir. Order, 2018-K-0546, 7/11/18; Inquiry Letter, 2018-K-0546, 7/27/18 (dated 6/18/18).

[38]St. Rec. Vol. 7 of 12, 4th Cir. Order, 2018-K-0693, 8/21/18; *see* Rec. Doc. No. 20, Attachment to Order (current docket master from the state trial court).

[39]St. Rec. Vol. 12 of 12, La. S. Ct. Writ Application, 18-KH-1615, 9/28/18 (dated 9/20/18).

[40]*Id.*

[41]St. Rec. Vol. 12 of 12, La. S. Ct. Order, 2018-KH-1615, 10/15/19.

## II.     <u>Federal Petition</u>

On January 13, 2020, Marx through current counsel filed a federal petition for habeas corpus relief in which he asserts the following grounds for relief:[42] (1) his due process rights were violated by the State's suggestion during rebuttal argument that untested DNA evidence linked petitioner to the crime; (2) his trial counsel was constitutionally ineffective for failing to properly raise and litigate the due process violation as described in *Miranda*; (3) his trial counsel was constitutionally ineffective for failing to object to the State's misuse and mischaracterization of DNA evidence during rebuttal argument; and (4) appellate counsel was constitutionally ineffective for failing to challenge the State's rebuttal DNA argument and failing to obtain transcripts of voir dire and opening and closing statements to search for errors.

The State filed a response in opposition to Marx's petition asserting that Marx failed to exhaust state court review of his claims and the claims are now in technical procedural default.[43] In the alternative, the State asserts that Marx's claims are without merit.

In response to the State's opposition, Marx argues that he exhausted review if the Court considers the various non-sequential efforts he and his counsel took through the state courts on appeal and multiple post-conviction proceedings.[44]  He also argues that his claims have merit.

## III.     <u>General Standards of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[45] applies to Marx's petition, which was filed by his counsel on January 13,

---

[42]Rec. Doc. No. 1-1, p. 3.

[43]Rec. Doc. No. 16.

[44]Rec. Doc. No. 19.

[45]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law that date, does not specify

2020. The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State does not challenge the timely filing of Marx's petition, but asserts that Marx failed to properly exhaust state court review of his claims. The State also suggests that Marx may now be barred from seeking further review in the state courts and his claims are technically procedurally defaulted. In response, Marx argues that his numerous filings and proceedings on appeal and post-conviction review should be considered in combination to determine exhaustion rather than requiring one chronological presentation of any particular claim.

The exhaustion doctrine, however, does not condone hodge-podge efforts to complete exhaustion. Instead, "state prisoners must give the state courts *one full opportunity* to resolve any constitutional issues by invoking *one complete round* of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate or collateral review procedures. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (emphasis added); *accord Duncan v. Walker*, 533 U.S. 167, 177-79 (2001). This opportunity must be completed in a procedurally proper manner in one complete cycle, not a combination of procedurally incomplete efforts like those in Marx's case. "Habeas petitioners must exhaust state remedies by pursuing their claims through one complete cycle of either state direct appeal or post-conviction collateral proceedings." *Busby v. Dretke*, 359 F.3d 708, 723 (5th Cir. 2004); *Baldwin*

---

an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes are effective at the moment they are signed into law. *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

*v. Reese*, 541 U.S. 27, 29 (2004) (fair presentation means presentation to "each appropriate state court"); *see Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999) (a petitioner fails to exhaust a claim when he raises it for the first time in the Louisiana Supreme Court after bypassing the state district and appellate courts).

In addition, the state courts must have a "'fair opportunity to pass upon the claim,' which in turn requires that the applicant 'present his claims before the state courts *in a procedurally proper manner* according to the rules of the state courts.'" *Mercadel*, 179 F.3d 271, 275 (5th Cir. 1999) (emphasis added) (quoting *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988)). In addition, the substance of a federal claim is deemed "fairly presented" in state court for purposes of the exhaustion doctrine only if the petitioner relies upon identical facts and legal theories in both of the state court proceeding and the action for federal habeas relief. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). For example, an ineffective assistance of counsel is not exhausted if the petitioner did not assert the same basis in the state court proceedings that is asserted in the federal habeas petition. *See Ogan v. Cockrell*, 297 F.3d 349, 358 (5th Cir. 2002) ("Because [petitioner] is now proceeding on a different theory than that advanced in the state habeas court, we find this ineffectiveness of habeas counsel claim to be unexhausted."); *Burns v. Estelle*, 695 F.2d 847, 849-50 (5th Cir. 1983) (factual basis underlying the ineffective assistance of counsel claim were "significantly different" from those raised in state court, and, therefore, were not exhausted).

The tortious procedural history of Marx's case leads to no clear conclusion that review of any of Marx's current federal claims have been properly exhausted in the Louisiana courts. The record is replete with generically labeled, non-specific, and/or unexplained claims, and those appear in the counsel-filed post-conviction pleadings. For example, in the 2017 counsel-filed post-

conviction application, counsel included self-described "generic claims" under *Brady* in case one might develop and included a challenge to Marx's "guilty plea" despite his conviction by jury. These troubling counsel-filed pleadings are coupled with Marx's numerous "supplemental" pleadings which often attack the counsel-filed pleadings and assert new, repetitive, restated, and/or recategorized claims. These pleadings make it difficult for any court to discern which, if any, of the current federal claims now urged under *Miranda* and *Strickland* have actually been argued properly to any one state court, much less at all levels of the state courts in a procedurally proper and contiguous proceeding.

In addition, as recognized by both parties, the claims asserted in the state courts are at times similar but perhaps not exactly as presented to other state courts or this federal court. Some of those "similar" claims were presented in one proceeding, either by counsel or Marx pro se, without having been fully or properly exhausted because of a subsequent procedural failing as the claim or its generic cousin proceeded through the state courts. There simply is no clear answer as to whether Marx has actually presented, much less exhausted, his claims and arguments in a procedurally proper manner in one complete round of state court review.

Nevertheless, the state court procedural quagmire does not prevent this federal habeas court from reviewing a meritless federal habeas claim without complete exhaustion. For this reason, the Court exercises its authority to overlook Marx's apparent failure to properly exhaust and address the substance of his meritless claims. 28 U.S.C. § 2254(b)(2).

## IV.    <u>Standards of a Merits Review</u>

The standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000). However, the AEDPA's deferential

standard of review applies only to claims adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d). When claims are not fully adjudicated on the merits in state court, or as here, where there is a question of complete and proper exhaustion, the deferential AEDPA standards of review do not apply. *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011); *Henderson v. Cockrell*, 333 F.3d 592, 597 (5th Cir. 2003). Instead, the federal courts review those claims under pre-AEDPA *de novo* standards of review. *Id*. at 598 (citing *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying *de novo* standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009).

Therefore, the Court will consider Marx's unexhausted claims *de novo*, although they would fail under either standard. As the Supreme Court has determined, a claim that fails under a *de novo* review would necessarily fail under AEDPA's deferential standard of review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

For the benefit of a reviewing court, the deferential standard under the AEDPA and *Williams* provides different standards for questions of fact, questions of law, and mixed questions of fact and law. A state court's determinations of questions of fact are presumed correct and the Court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485. The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. 415, 427 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White*, 572 U.S. at 426 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it correctly identifies the governing rule but then applies it unreasonably to the facts. *White*, 572 U.S. at 426-27; *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *See Williams*, 529 U.S. at 410. The Court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *Id*. "'[A] federal habeas court may not issue the writ simply

17

because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181.

## V.    Prosecutorial Misconduct (Claim No. 1)

Marx claims that the prosecutor violated his due process rights by suggesting during rebuttal argument that the untested DNA evidence linked him to the murder of his wife. He argues that the State's reference or suggestion to the presence of Marx's DNA in the home was prejudicial and deceptive. In opposition, the State argues that the rebuttal statement Marx references was the prosecutor's response to the defense's theory that the lack of DNA evidence and/or the police's failure to test for DNA demonstrated a lack of evidence to link Marx to the murder and a left open the possibility that he was not guilty.

A prosecutor's comment does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the trial was rendered fundamentally unfair in violation of the Due Process Clause. *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988). "[I]t is not enough

that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and quotations omitted); *accord Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988); *Bell v. Lynaugh*, 828 F.2d 1085, 1095 (5th Cir. 1987).  The prosecutor's remarks must be evaluated in the context of the entire trial.  *Greer v. Miller*, 483 U.S. 756, 765-66 (1987) (citing *Darden*, 477 U.S. at 179); *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985).

A two-step analysis is utilized when reviewing claims of prosecutorial misconduct.  *United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000); *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999).  First, the court must determine whether the prosecutor made an improper remark. *Wise*, 221 F.3d at 152.  It is well settled that the prosecution may permissibly argue to the jury the "inferences and conclusions" that it should draw from the evidence, so long as the assertions are based on the evidence.  *United States v. Delgado*, 672 F.3d 320, 336 (5th Cir. 2012) (citations omitted).  In assessing the meaning and impact of a prosecutor's comments, the Supreme Court cautions that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).

If the court finds that an improper remark was made, "the second step is to evaluate whether the remark affected the substantial rights of the defendant."  *Wise*, 221 F.3d at 152.  A habeas corpus petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks."  *Jones*, 864 F.2d at 356; *accord Hogue v. Scott*, 874 F. Supp. 1486, 1533 (N.D.

Tex. 1994). Under this test, a petitioner must demonstrate that the comment rendered his trial "fundamentally unfair" by showing "a reasonable probability that the verdict might have been different had the trial been properly conducted." *Rogers*, 848 F.2d at 609 (footnote and citations omitted).

As an initial matter, the Court is compelled to note that, although Marx references the purported closing arguments of both his trial counsel and the prosecutor, he has not provided an actual copy of the closing arguments transcripts. Marx instead quotes an isolated paragraph from the alleged rebuttal testimony and cites to the argument at "R. at Vol. 3" at pages 21-22 and 27.[46] Clearly, this does not reference the records of this federal habeas court, and it does not match any of the certified state court records produced by the respondent. The transcript simply is *not* in the certified state court record or part of any state court pleading or any pleading in the federal record. Despite this irregularity, the State acquiesces to and even quotes the language attributed to the prosecutor directly from Marx's memorandum in support of his federal habeas petition.[47]

Assuming the accuracy of the quoted text, as the parties do, the Court's consideration still must involve a review of the entire proceeding. As Marx readily concedes, his trial counsel made a concerted and repeated effort throughout the trial to convince the jury that the failure to test for DNA and latent print evidence or present such evidence linking Marx to the crime was a critical failure in the State's evidence of guilty.[48] This included trial counsel's questions to the State's witnesses about the recovery of DNA and print evidence and its evidentiary relevance in an

---

[46]Rec. Doc. No. 1-1, p. 17, fn. 30-32.

[47]Rec. Doc. No. 16, p. 35-36, n.79.

[48]Rec. Doc. No. 1-1, p. 16, 17.

investigation.[49]  Marx also demonstrates that his trial counsel aptly referenced the DNA related

testimony in his closing argument, as quoted and redacted in Marx's memorandum in support:

> They collected evidence from the scene of Mary Marx's death.  They collected
> knobs so they could get the DNA.  Detective Morton explained to you how DNA
> would get on those knobs.  They collected door knobs in the entryway. …. The
> NCIS, very professional man who gathered evidence.  He said he gathered it in a
> way to protect the integrity of the evidence, that is, so that it can be tested for DNA.
> And he explained DNA would've been on those papers.  They check it for prints.
> They he [sic] explained it could have prints on it.  And we would know then who
> touched those papers, and didn't.  We would know whether or not David Marx ever
> that box that was under the seat… We don't know.  They want you guessing.

(ellipses in original) Record Document No. 1-1, p. 17.  This is a direct reference by defense counsel

to the State's failure to test the DNA and/or failure to provide the jury with a DNA link to Marx at

the murder scene.  The goal clearly was to suggest to the jury that this evidence was so important

that the police took doorknobs from the house yet failed to test them, leaving nothing to directly

link Marx to the crime scene and leaving open a plausible hypothesis of his innocence.  This type

of argument is critical in a case based on circumstantial evidence in Louisiana.[50]

Despite this argument and the defense's theory, Marx argues that it was the prosecutor who

improperly referenced DNA evidence in the rebuttal argument.  As noted above, Marx quotes an

isolated paragraph from the State's rebuttal argument in his memorandum:

> *The evidence that damned the defendant, stuff that's found in his own vehicle, has
> his own DNA on it.*  It came from his own car.  All of the DNA in the world on
> those pieces of paper wouldn't make a difference to any of you at all because it's
> from his vehicle.  All of the DNA in the world from that house, that crime, [sic]
> scene, wouldn't have made a difference to you all because he lived in that very
> house.  And what would he have done as soon as his DNA was presented after hours

---

[49]St. Rec. Vol. 4 of 12, Trial Transcript, pp. 119-121, 12/3/13; St. Rec. Vol. 5 of 12, Trial Transcript, pp. 105-107, 12/4/13.

[50]In Louisiana, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. Rev. Stat. § 15:438. Dutiful counsel focuses the jury on any theory of innocence or leaves doubt as to guilt.  However, "[i]f a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails." *State v. Maxie*, 614 So. 2d 1318, 1321 (La. App. 3d Cir. 1993); *accord State v. Williams*, 693 So. 2d 204, 209 (La. App. 4th Cir. 1997).

or [sic] testimony, well, I lived in that house, or that car was mine. *That's how my DNA got on those objects*.

(emphasis in original) Record Document No. 1-1, p. 17.

The defense presented a theory and clearly implied, if not directly stated (in the quote redacted by Marx), that the State was remiss in failing to test and provide evidence that Marx's DNA was at the scene. In response to that contention, the State responded that any presentation of Marx's DNA found on items in *his* car and *his* home would have done no more than confirm the obvious. That is, if DNA had been found on items recovered from *Marx's* car and *Marx's* house, of course *Marx's* DNA would have been present on items that belong to him. Further, the State argued, if they had presented DNA evidence from his belongings, Marx simply would have replied, "I live in that house, or that car was mine," and "That's how my DNA got on those objects."[51]

That is not a circular argument as Marx's suggest, but a comment on the obvious conclusion that a reasonable person could expect Marx's DNA to be on his property and in his home. That is the reasonable interpretation with no sinister inference to be drawn from it in light of the defense's theory. Thus, reading the isolated comment in light of the record as a whole, Marx has failed to establish that the prosecutor made an improper or prejudicial remark under the first step of the prosecutorial misconduct test.

Furthermore, even if the prosecutor's comment could be read to have pressed the boundaries of proper rebuttal, there is nothing to establish that the prosecutor's made other, pervasive comments or that the isolate statement had an improper influence on the jury or injurious effect on the outcome of the trial. Marx's unsupported and conclusory arguments are not sufficient

---

[51]Record Document No. 1-1, p. 17.

to meet his burden based on the isolated nature of the rebuttal statement. The fact that Marx was convicted also is not enough to establish that the isolated rebuttal comment was prejudicial or impacted the verdict. The jury heard and received Marx's detailed confession, the eyewitness identifications, and the other circumstantial evidence of his guilt, all of which the jury apparently found credible and convincing.[52] The State's rebuttal to the defense's attack on the lack of DNA evidence had no apparent or unconstitutionally prejudicial impact on the outcome of the case or the verdict in light of the record as a whole.

Under the Court's *de novo* review, Marx has failed to establish prosecutorial misconduct occurred in violation of his constitutional rights. Thus, even if the state courts had the opportunity to consider this claim, the denial of relief would not have been contrary to or an unreasonable application of the federal law cited above.[53]

## VI.    Effective Assistance of Counsel (Claim Nos. 2, 3, 4)

Marx alleges that he was denied effective assistance of counsel when his trial counsel failed timely and properly to challenge the constitutionality of his confession given to NOPD Detective Morton under *Miranda*, on grounds of promises related to the safety and well-being of Marx's son, I.M.[54] Marx also argues that his trial counsel was ineffective for failing to object to the prosecutor's rebuttal argument regarding DNA evidence, addressed *supra*.[55] Finally, Marx claims that his appellate counsel was similarly ineffective for failing to assert as error on direct appeal the prosecutor's rebuttal argument regarding DNA evidence. He also argues that appellate counsel

---

[52]*See* the Louisiana Fourth Circuit's thorough assessment of the sufficiency of the evidence on direct appeal. *Marx*, 163 So.3d at 47-55; St. Rec. Vol. 5 of 12, 4th Cir. Opinion, 2014-KA-0332, pp. 2-17, 3/4/15.

[53]*See Brazley v. Cain*, 35 F. App'x 390, 2002 WL 760471, at *4 n.4 (5th Cir. Apr. 16, 2002) (for purposes of federal habeas review, a prosecutorial misconduct claim presents a mixed question of law and fact requiring the court to determine whether the denial of relief was contrary to or an unreasonable application of Supreme Court law.)

[54]Rec. Doc. No. 1-1, pp. 20-24.

[55]Rec. Doc. No. 1-1, pp. 24-25.

was ineffective for failing to obtain and review the transcripts of voir dire and opening and closing arguments to search for possible errors.[56]

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom.  *See Strickland*, 466 U.S. at 687.  The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence.  *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992).  In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001).  "The defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88.  The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances.  *See id.*, 466 U.S. at 689; *Carty*, 583 F.3d at 258.  The reviewing court must "judge . . .  counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 689).  "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the

---

[56]Rec. Doc. No. 1-1, pp. 25-26.

harsh light of hindsight." *Bell*, 535 U.S. at 702 (citing *Strickland*, 466 U.S. at 689).  As a result, federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise.  *Strickland*, 466 U.S. at 689; *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (counsel's "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.") (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)); *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008).

To prove prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010).  Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice."  *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695).  In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at. 694).  This standard requires a "substantial," not just "conceivable," likelihood of a different result.  *Harrington*, 562 U.S. at 112.  To determine whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986).  Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief.  *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

On habeas review, the Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing

professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105. This Court must also apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690; *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999).

Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise by the petitioner. *Strickland*, 466 U.S. at 689; *Geiger*, 540 F.3d at 309; *Moore*, 194 F.3d at 591. In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland*, 466 U.S. at 689; *Neal*, 286 F.3d at 236-37; *Clark v. Johnson*, 227 F.3d 273, 282-83 (5th Cir. 2000). Tactical decisions, when supported by the circumstances, are objectively reasonable and do not amount to unconstitutionally deficient performance. *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) (citing *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) and *Mann v. Scott*, 41 F.3d 968, 983-84 (5th Cir. 1994)).

A.    **Trial Counsel**

1.    **Suppression of the Confession**

Marx alleges that it was deficient performance and prejudicial when his trial counsel failed properly to pursue suppression of his confession based on the alleged promises made to him by Detective Morton before his recorded inculpatory statement in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Although Marx's counsel-filed petition references *Miranda*, the pleading asserts no specific argument under *Miranda* and instead focuses on the alleged promise to challenge the confession he gave to Detective Morton.

As Marx referenced, his counsel on direct appeal asserted claims that the state trial court erred when it failed to suppress the confession on grounds of promises made by Detective Morton to Marx with regards to his ability to communicate with I.M. and failed to grant the motion to reconsider filed after the trial.[57]  The Louisiana Fourth Circuit, however, declined to consider the claims because it could not locate or confirm that counsel filed a written or oral motion to suppress in the state trial court on that grounds or find any relevant argument or testimony at the motion hearing held by the state trial court on September 13, 2012.  Instead, the Louisiana Fourth Circuit noted that the first indication of alleged promise was derived from defense counsel's trial questioning of and testimony from the NCIS Agent Bozin, who overheard some of the conversation between Detective Morton and Marx, and of course Marx's trial testimony claiming he was coerced and intimidated.  The Court concluded that there was no evidence before the trial court at the motion hearing in 2012 of any "so-called inducements or promises."[58]

The appellate courts factual resolve is, however, incongruous with the record and Marx's own arguments.  While proposing that no such motion was "filed," the Court provides detailed references to the scheduling of and the actual motions hearing itself on "the motions that lie," which ultimately included the motion to suppress Marx's inculpatory statements.[59]  At the September 13, 2012, hearing, referenced by the Louisiana Fourth Circuit, the state trial court was advised by the prosecutor and defense counsel that "the motions that lie here are suppression of evidence and *statement* and [. . .] identification proceedings."[60]

---

[57]*Marx*, 163 So.3d at 55-58; St. Rec. Vol. 5 of 12, 4th Cir. Opinion, 2014-KA-0332, pp. 17-22, 3/4/15.

[58]*Marx*, 163 So.3d at 56; St. Rec. Vol. 5 of 12, 4th Cir. Opinion, 2014-KA-0332, p. 20, 3/4/15.

[59]*Id*.

[60](emphasis added) St. Rec. Vol. 4 of 12, Hearing Transcript, p. 3, 9/13/12.

In acknowledging this practice and citing La. Code Crim. P. arts. 521, 703, *et seq*., Marx recognizes that the standard operating procedure in the Orleans Parish Criminal District Court would not have been for his trial counsel to file a separate motion to suppress:[61]

> This Court is, perhaps, aware of that peculiar species of localized and informal court rules, unwritten yet universally followed, that pervades Orleans Parish Criminal District Court. Whereas defendants in other parishes are called upon to file particularized pre-trial motions within 15 days of arraignment, the practice persists in Orleans Parish criminal courts for a preliminary hearing and a garden-variety motion hearing to be presumed and set as a matter of course without a specific invocation by client or counsel. While, often, an omnibus motion will be subsequently filed providing generalized justification and citation, even this practice is often ignored and the basis for the ersatz motion hearing is not set forth until just prior to calling the first witness when the Court inquires: "What motions lie?"

Thus, as a matter of accepted and standard practice in that court, it was reasonable performance for Marx's counsel not to file a separate motion and instead to assert suppression of the statement during the omnibus hearing. As discussed below, the suppression motion for the statements did "lie" and both Agent Bozin and Detective Morton were questioned in detail about the statements, although not specifically about an alleged promise that Marx could contact his son. That was not asserted until the post-trial motion to reconsider. The mere failure to repeat the motion in writing was not *per se* unreasonable practice or deficient under the first *Strickland* factor.

Nevertheless, Marx argues that trial counsel's failure to file a specific motion, rather than rely on the tradition of the local court, was prejudicial in his inability to have the claim properly reviewed in later state court proceedings. Marx does not indicate or establish that his counsel was aware that there was an issue of a promise prior to trial or when the state trial court held the "ersatz motion" hearing on September 13, 2012. His counsel could only argue that which was known and supportable. According to the record, and Marx's prior pleadings, the idea of the promise as

---

[61](footnote omitted) Rec. Doc. No. 19, pp. 11-12.

coercion for the detailed inculpatory statement given to Detective Morton was *only* discovered by the defense during trial.  As the state appellate court concluded, there was no evidence of any promise at the time of that hearing or at any time before trial.  It is inconsistent for Marx to argue that somehow his trial counsel should have known of a fact that had not yet been disclosed until trial and use that undiscovered fact to file a more detailed motion prior to trial.

Furthermore, as cited above, Marx does not account for the fact that the officers testified at the September 13, 2012, hearing that they used no coercion or other improper means to compel either recorded statement from Marx.  Even if his counsel had filed a written motion discussing the promise or asked more direct questions about a promise in the pretrial hearing, it is unlikely that the officers' testimony would have changed in a manner to have altered the outcome of the suppression hearing itself.  To support this conclusion, it is compelling that Agent Bozin and Detective Morton testified again at trial that they made no promise and used no coercion or intimidation to obtain the statements from Marx.

Nevertheless, even if it is presumed that Marx's trial counsel should have filed a more specific, written motion to suppress for the sake of more clearly preserving the claim for appeal, Marx has not established that his statement was unconstitutionally coerced by a promise or that counsel's actions had a prejudicial impact on the actual verdict.  The Supreme Court recognizes two inquiries to determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir. 2002).  First, waiver of the right must be voluntary and not the product of intimidation, coercion, or deception.  *Moran*, 475 U.S. at 421.  Second, the waiver or relinquishment must be made with full awareness of the nature of the right being waived.  *Id*.  In making these inquiries, the court must consider the "totality of all the surrounding

circumstances - both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

In assessing voluntariness, "trickery or deceit is only prohibited to the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Soffar*, 300 F.3d at 596 (quoting *Moran*, 475 U.S. at 424). Therefore, a finding of coercive police conduct is a necessary prerequisite to a conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 163-67 (1986)).

Determining whether an officer engaged in coercive tactics to elicit a confession is a question of fact, and the state court's factual findings are entitled to deference when supported by the record. *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993); *Self v. Collins*, 973 F.2d 1198, 1204 (5th Cir. 1992); *see also Miller*, 474 U.S. at 112 (noting that subsidiary questions such as whether the police engaged in coercive tactics are afforded the presumption of correctness). Thus, federal judges are to respect credibility determinations made by the state court trier of fact. *Pemberton*, 991 F.2d at 1225 (citing *Sumner v. Mata*, 455 U.S. 591, 597 (1982)). However, if the underlying facts as determined by the state court fact finder indicate the presence of some coercive tactic, the impact that factor had on the voluntariness of the confession is a matter for independent federal determination and is ultimately a legal determination. *Miller*, 474 U.S. at 117; *ShisInday v. Quarterman*, 511 F.3d 514, 522 (5th Cir. 2007).

If the confession is deemed involuntary under these standards, the Supreme Court has held that the admission of an involuntary confession is a trial error subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991). Under these standards, to grant federal

habeas relief, the trial error must have a substantial and injurious effect or influence in determining the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Therefore, even if this court were to find that petitioner's Fifth Amendment rights were violated, the Court would also consider whether use of the confession at trial was harmless in determining the verdict. *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003).

In Marx's case, consistent with *Jackson v. Denno*, 378 U.S. 368 (1964), on September 13, 2012, the state trial court conducted an evidentiary hearing on the generic motion to suppress Marx's statements and the admissibility of the inculpatory statements taken by Agent Bozin and Detective Morton. Agent Bozin testified that, on May 27, 2011, Marx was advised of his constitutional rights and the contents of the NCIS waiver of rights form, on which he acknowledged and initialed each of his rights and signed the waiver.[62] That waiver also included his acknowledgment that "[n]o threats or promises" had been made to him. Agent Bozin also testified that he did not force, threaten, or coerce Marx into giving the statement or signing the waiver form.[63] During that statement, Marx admitted orally and in writing that, while on his Florida vacation, he drove to New Orleans to "reminisce for a little bit."[64]

Detective Morton also testified that he spoke to Marx by telephone several times prior to his arrest, once to notify him of his wife's death and two other "conversations regarding his son and how that would be handled."[65] He thought it odd that Marx seemed surprised about her death, but did not ask him how it happened or about any details of her death and they never discussed the

---

[62]St. Rec. Vol. 4 of 12, Hearing Transcript, p. 3, 9/13/12.at pp. 9-10.

[63]*Id*. at pp. 10, 11.

[64]*Id*. at p. 11.

[65]*Id*. at p. 18.

manner of death during any of the phone calls.[66]  He further testified that, after Marx's arrest, he

flew to Virginia Beach to interview Marx.[67]  Prior to taking his recorded confession, Detective

Morton again advised Marx of his constitutional rights and the contents of the NOPD waiver of

rights form, which Marx indicated verbally and by signing that he understood and waived.[68]  Marx

then proceeded to provide a detailed explanation of the steps he took to plan and murder his wife.[69]

Detective Morton also testified that he did not force, threaten, or coerce Marx into giving the

statement or signing the waiver form.[70]  Marx also did not ask for an attorney.[71]

     Following this testimony, the state trial court denied the motion to suppress the statements

and the other motions before it.[72]  As noted by the Louisiana Fourth Circuit on direct appeal, there

were no specific questions asked at the hearing about promises related to communicating or

visiting with I.M., although Detective Morton acknowledged that, prior to his arrest, Marx asked

him over the phone about I.M.'s well-being.

     At trial, Detective Morton testified that when he and Agent Bozin met Marx in the Virginia

Beach jail, Marx immediately told them that he did not want to talk to Agent Bozin, who then left

---

[66]*Id.* at pp. 18, 26.

[67]*Id.* at pp. 21, 26.

[68]*Id.* at pp. 21-22.

[69]Detective Morton also testified that, during the recorded statement, Marx stated that he and his wife had a troubled relationship and disagreed over prescribed medication for their disabled son and how she spent the money he sent home.  *Id.* at p. 23.  He stated that he wanted to leave his wife because of her abusive treatment of him and his son, but knew he could not get custody due to his two illnesses.  *Id.*  Marx also stated that he "decided  that he was going to do what he had to do to gain custody of his son.  And the only way he saw that happening was with his wife deceased."  *Id.*  Marx continued to explain to Detective Morton the details of how he planned the Florida trip as an opportunity to go to New Orleans to harm his wife.  Marx explained that he hid with the weapon under the house until he could enter the home using his key while she was taking their son to school.  *Id.*  He further explained that he became upset at the condition of the home and lack of healthy food.  *Id.* at p. 24.  When he heard his wife enter the back door, without saying a word, he fired one crossbow bolt, or arrow, into her chest.  She fell to the floor and he walked over and shot her with a second bolt in the face.  *Id.*  He left the home and returned to Pensacola.  *Id.*

[70]*Id.* at pp. 22.

[71]*Id.* at 27.

[72]*Id.* at p. 28.

the room.[73]  When Detective Morton told Marx he was NOPD and had spoken with him on the phone, Marx immediately asked about his son.[74]  Marx continued to talk about his son's homelife and his disapproval of his wife's abusive manner of care for their son.[75]  He also told Detective Morton that his wife was abusive and unsympathetic to him with regard to his own respiratory condition and had on occasion wished him and their son dead.[76]  Marx did most of the talking in a conversational way without questions from Detective Morton.[77]  As Marx got more emotional, Detective Morton finally asked Marx if he hurt his wife, and Marx replied, "Yes."[78]  At that point, Detective Morton told Marx he wanted to take a formal, recorded statement and Marx agreed.[79]  Detective Morton advised Marx of his constitutional rights under *Miranda* and reviewed the NOPD rights of arrestee form.[80]  Marx acknowledge his understanding of each of his rights and signed the waiver.[81]  Detective Morton also reviewed Marx's rights with him during the audio recorded interview.[82]  The jail was not equipped with video equipment.[83]  After the confession was concluded, Marx continued to talk and asked Detective Morton if he could contact his family in Alaska to tell them where he was.  The Detective dialed a number Marx provided but there was no answer.[84]

---

[73]St. Rec. Vol. 5 of 12, Trial Transcript, pp. 91-92, 12/4/13.

[74]*Id*. at pp. 91-92.

[75]*Id*. at pp. 92-93.

[76]*Id*. at p. 93.

[77]*Id*. at p. 113, 117.

[78]*Id*.

[79]*Id*. at pp. 93-94.

[80]*Id*. at p. 94.

[81]*Id*. at pp. 94-96, 97.

[82]*Id*. at pp. 96-97.

[83]*Id*. at p. 94.

[84]*Id*. at p. 100.

Detective Morton testified on cross-examination that the unrecorded initial conversation lasted much less than two hours.  The Detective again noted that he confused the Eastern and Central time-zones in his report.  He explained that his Blackberry indicated 4:00 p.m. Central when got to the jail to meet Marx, and he referred to the clock on the wall, which showed 5:50 p.m. Eastern, when he started the recorder.[85]  With the time correction, the actual conversation time was not 2 hours before he started the recorder for the formal statement.[86]  On cross-examination, Marx's counsel repeatedly asked what interrogation "methods" Detective Morton used to garner the confession when Marx did not confess to the NCIS "professional[s]" the night before.[87]  The Detective repeatedly responded that he did not use a particular "method" when talking with Marx, and that Marx initiated the conversation and just continued to talk.[88]  When asked by defense counsel if he made any promises, Detective Morton denied doing so.[89]

> Q.    Just one other thing I did forget, in that hour and fifty minutes or fifty minutes between your arrival and when you turned the computer on, did you make any promise to Mr. Marx that if he talked to you, told you the things he said, that you were going to allow him to have his son?
>
> A.    No, I didn't make - - allow him to have his son?
>
> Q.    Or be with his son, see his son?
>
> A.    No. I didn't make any promises to him.  I told him once he was here and incarcerated, he would have visitors.  It was something that effect, but I made no promises to him.  And in the recorded segment of it, we went, in the beginning and at the end, it is our procedure and we are taught to ask, "Did anyone make any promises to you?  Did anybody coerce you in any way to give this statement," at the beginning and at the end.  And most people, you know, they're going to tell the truth at that point or have some sort of reaction.

---

[85]*Id.* at pp. 118-19.

[86]*Id.* at pp. 100, 118-19.

[87]*Id.* at pp. 112, 116-117, 119-20.

[88]*Id.* at pp. 112-13, 116-117, 120-21.

[89]*Id.* at pp. 127-28.

Q.      And we can be satisfied that even though for an hour and fifty minutes to an hour and fifty minutes [sic] that wasn't recorded, that you didn't in any way coach him into what he had to say?

A.      I would be satisfied that an adult, who is a responsible person, a member of the military for life, which I have a great deal of respect for, would have enough control to say, stop, or I didn't do this, or something like that, and have enough, or for lack of a better word, common sense to not confess to killing their wife.

On redirect examination, the prosecutor again asked Detective Morton if he forced, coerced, or threatened Marx to give a statement, and he answered, "No," explaining that Marx was "forthcoming" and said what he wanted to say.[90]  The following exchange continued:[91]

Q.      Okay.  At any point did he ask to see his son?  You had indicated - - I'm sorry.  You had indicated something about the fact that there would be visitation?

A.      Right.  He asked if he would see his son in New Orleans.  And we talked about visitation in jail once, you know, you're incarcerated, you're not going to go to the park or anything, but he would, you know, probably be allowed visitors.

Q.      At any point, did you promise him anything in exchange for his statement?

A.      No.  And like I said, this was very unique because he wanted to say what happened and what led to the incident.

Agent Bozin was next called and also questioned about the interview between Detective Morton and Marx.[92]  He stated that, because Marx did not want to talk to him, he stepped out of the closed room but could still hear almost all of the conversation.[93]  Although he was not sure, he recalled that the two men spoke for only about 20 minutes before Detective Morton started the

---

[90]*Id*. at p. 132.

[91]*Id*.

[92]*Id*. at p. 136.

[93]*Id*. at pp. 136, 144.

recording device.[94]  He heard Detective Morton read him his rights.[95]  He did not hear Detective Morton threaten, force, or coerce Marx into confessing or giving the statement.[96]

On cross-examination, Agent Bozin recalled from his own interview that Marx was concerned about his son.[97]  He also heard Marx talk to Detective Morton about his son throughout the conversation until Marx began to just describe the murder.[98]  He recalled hearing Detective Morton mention that Marx would have some opportunity to contact his son, "see or call."[99]  Bozin indicated that Marx's concern was in his opinion a theme that could be used during an interrogation under a certain method or style of interview technique.[100]

In his own testimony, Marx indicated to the jury that since 2007, his wife and son remained in New Orleans rather than move to his Virginia location.[101]  At the time of the murder on May 25, 2011, Marx had not seen his I.M. since December of 2010.[102]  After his wife's murder, he had only one contact with I.M. in April of 2012 when I.M. wrote him a letter.[103]  I.M. had given the letter to his doctor to mail to Marx in jail.[104]  Marx also acknowledged that, rather than use his 2011 vacation to visit his son he had not since in five months, he went to Pensacola with his girlfriend.[105]

---

[94]*Id*. at p. 137.

[95]*Id*.

[96]*Id*.

[97]*Id*. at pp. 139-40.

[98]*Id*. at p. 144.

[99]*Id*. at p. 147.

[100]*Id*. at p. 148.

[101]St. Rec. Vol. 5 of 12, Trial Transcript, p. 26, 12/5/13.

[102]*Id*. at p. 29.

[103]*Id*. at pp. 28-29.

[104]*Id*. at pp. 28-29.

[105]*Id*. at pp. 29-30.

Marx also testified that he felt "intimidated, shocked, dismayed," and "coerced" when he was questioned by the NCIS officers so soon after his wife's death, because they "backed [him] up into a corner."[106]  He denied any knowledge of the inculpatory items seized from his car and home.[107]  He also denied going to New Orleans while he was on his Pensacola trip, claiming again that he only told the NCIS officers what they wanted to hear, because he was "fatigued," they "coerced" and "intimidated" him, and they "backed [him] into a corner."[108]

Marx also testified that as he asked to speak with a lawyer as he was escorted to the room to speak to Agent Bozin and Detective Morton, but was not provided one.[109]  Marx began to say that he told Agent Bozin he did not wish to speak to him, and then mid-sentence changed to say he did not speak at all, and Agent Bozin simply walked out of the room of his own accord.[110]  With regard to his conversation with Detective Morton, Marx stated that, before the recorder was turned on, the Detective told him about all of the details of his wife's murder.[111]  He testified that he simply repeated these details in his recorded confession.[112]  He also stated that, before the recorded statement, Detective Morton "promised to get my son back" and promised to get I.M. "to Alaska with the custody with your mom and dad, and I can set up visits for you with your son."[113]

On cross-examination, however, Marx seemingly denied that he was intimidated into confessing to the murder.[114]

---

[106]*Id.* at p. 31.

[107]*Id.* at p. 32.

[108]*Id.*

[109]*Id.* at p. 34.

[110]*Id.*

[111]*Id.*

[112]*Id.* at p. 35.

[113]*Id.* at p. 36.

[114]*Id.* at p. 37.

Q.    Now, prior to the break we just heard you testify, and certainly I don't want to mince your words. But I do believe you said you were very intimidated, coerced, "they backed me into a corner.  They intimidated me into confessing the murder of my wife," correct?

A.    No, they didn't.

Q.    These are your words.  "I felt very intimidated, coerced," is that correct?

A.    That's correct.

Marx testified that despite his military training and career in the Navy, Detective Morton intimidated him to confess by telling him the details of his wife's murder, asking about his son, and saying he could get his son back.[115]  As for his son's medical care, Marx did not know the names of the medicines I.M. was taking but was "coerced" by NCIS officers to complain on tape that it cost him $250 a month.[116]  He also could not explain why before the murder he had not seen his son since December of 2010 but allowed his girlfriend's son to stay with them in the apartment in Virginia.[117]  He also acknowledged that he had not sent any money to the assigned foster parents for I.M.'s care, although he planned to make arrangements to do so.[118]  He also acknowledged that had he divorced his wife, she would have received 50% of his pension when he retired.[119]  Instead, his pension was now deposited in full into his checking account over which his girlfriend, Michelle Conry, had power of attorney.[120]  He also conceded he had not called I.M. at any time from jail because he did not have custody, although he stated that he wrote to him.[121]

---

[115]*Id*. at pp. 42-43.

[116]*Id*. at p. 44.

[117]*Id*. at pp. 44-45

[118]*Id*. at pp. 45-46.

[119]*Id*. at p. 51-52.

[120]*Id*. at pp. 45-46.

[121]*Id*. at p. 49.

Considering the testimony at the suppression hearing and trial and the totality of the circumstances surrounding Marx's statements,[122] there is no credible evidence or facts to support Marx's self-serving contention that his statement to Detective Morton (or the NCIS officers) was coerced by promise that he would have his son returned to him while he was in prison or sent to Alaska to be with Marx's parents. In both statements, Marx initiated the discussion about I.M.'s welfare. Marx does not claim that he did not understand his constitutional rights under *Miranda* or that he did not voluntarily sign the waiver of those rights. He simply claims that he was intimidated by Detective Morton's promises that he could communicate with his son.

Considering the circumstances of Marx's interview, it is compelling that Marx ordered Agent Bozin out of the interview room when Bozin and Detective Morton were at the Virginia Beach jail. This bold command is quite a contrast to someone who claims to have been intimidated by these same officers. It also demonstrates a clear understanding that Marx knew and understood that he did not have to speak to anyone if he did not want to speak.

Marx also provided extraordinary detail about his planning and execution of wife's murder. While he claimed that he learned the details from Detective Morton, the Detective denied telling him any details, and, in fact, the Detective was bothered by the fact that Marx never asked about the details or how she died. Marx on the other hand provided extraordinary detail about the murder of his wife, including how he hid under the home until light of day, something Detective Morton could not have known or prompted.

The record includes other relevant circumstances that contradict Marx's claims of actual concern for his estranged son's welfare even before the murder. For example, Marx had not seen his son since December of 2010. Marx told NCIS officers that while in Pensacola, he drove to

---

[122]*See Schneckloth*, 412 U.S. at 226.

New Orleans to reminisce but did not to see his son. Marx also has not reconciled his lack of effort to call or see his son after the murder. While he indicated that he wrote to I.M. from jail, he also testified in contradiction that his only communication with I.M. after the murder was in April of 2012 (20 months before the trial) when I.M. wrote to him. There is nothing in the record to support his contention that his concern for his estranged son, coupled with a promise that he could see his son, whom he did not attempt to see or support after the arrest, could have compelled him to confess to a murder he did not commit.

Even so, the circumstances of the discussions between Detective Morton and Marx do not reflect an unconstitutional influence, coercion, or promise to have obviated Marx's understanding and voluntary waiver of his constitutional rights. Marx's voluntarily and detailed statement confessing to his wife's murder was made without unconstitutional coercion or promise to coax him.

Having resolved that Marx's confession was not unconstitutionally obtained, Marx has not established prejudice under *Strickland*. There was no prejudice to the proceeding resulting from trial counsel's failure to file a separate motion to suppress based on a promise related to his son's welfare or to have preserved the claim for later review in the state courts. Counsel was not ineffective for failing to file a baseless or meritless motion. *Evans v. Davis*, 875 F.3d 210, 218 (5th Cir. 2017) ("Obviously, counsel is not deficient for failing to make a meritless . . . motion."); *Darby v. Johnson*, 176 F.3d 479, 1999 WL 153045, at *2 (5th Cir. 1999) ("Trial counsel's failure to assert a meritless motion cannot be grounds for a finding of deficient performance."); *accord Soliz v. Davis*, 750 F. App'x 282, 293 (5th Cir. 2018) (quoting *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007)).

Under the Court's *de novo* review, Marx has not established that he was denied effective assistance of counsel under *Strickland*. If the state courts had been given the opportunity to address this claim in a procedurally proper manner, the denial of relief would not have been contrary to or an unreasonable application of federal law.[123]  Marx is not entitled to relief on this claim.

## 2.    **Object to Prosecutor's Rebuttal**

Marx also contends that his counsel was ineffective for failing to object to the DNA evidence reference made by the prosecutor during rebuttal argument.  As this Court has in detail determined, there was no inappropriate rebuttal argument made by the prosecutor to result in prosecutorial misconduct.  The argument of the State was instead responsive to defense counsel's suggestion that the State erred and failed to produce Marx's DNA evidence from the crime scene and on other recovered evidence.  Counsel does not provide ineffective assistance by failing to assert a baseless or meritless objection.  *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (counsel is not required to make futile motions or frivolous objections); *Smith v. Puckett*, 907 F.2d 581, 585 n. 6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); *see also Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) (" '[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.' ") (quoting *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (concluding that "counsel is not required to make futile motions or objections.").

Marx has shown no error or deficient performance by his counsel under *Strickland* in failing to object to the prosecutor's rebuttal argument.  Had the state courts been given the

---

[123]The denial of effective assistance of counsel under *Strickland* is a mixed question of law and fact.  *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010).  Under the AEDPA, the Court would determine whether the state courts' denial of relief was contrary to or an unreasonable application of Supreme Court law.

opportunity to address this claim in a procedurally proper manner, the denial of relief would not have been contrary to or an unreasonable application of federal law.[124]  Marx is not entitled to relief on this claim. He is not entitled to relief on this claim.

### B.    Appellate Counsel

Marx alleges that he was denied effective assistance when his appellate attorney failed to obtain and review the transcripts of voir dire and opening and closing arguments to search for possible errors to raise on appeal.  He also asserts that appellate counsel erred by failing to assert on direct appeal a claim of prosecutorial misconduct based on the prosecutor's rebuttal argument regarding DNA evidence.

Criminal defendants are entitled to effective assistance of counsel in their first appeal of right.  *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).  The *Strickland* standard for judging performance of counsel also applies to claims of ineffective appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).  To prevail on a claim that appellate counsel was constitutionally ineffective, a petitioner must show that his appellate counsel unreasonably failed to discover and assert a nonfrivolous issue and establish a reasonable probability that he would have prevailed on this issue on appeal but for his counsel's deficient representation.  *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001); *Smith,* 528 U.S. at 285-86. "[T]the applicable test to be applied in assessing such a claim is instead whether the issue ignored by appellate counsel was 'clearly stronger' than the issues actually presented on appeal." *Matthews v. Cain*, 337 F. Supp.3d 687, 712 (E.D. La. Aug. 29, 2018) (order adopting report) (citing *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. Apr. 11, 2007) and *Smith*, 528 U.S. at 288).

---

[124]*Id.*

Marx has failed to establish that appellate counsel was ineffective for failing to obtain and peruse the voir dire, opening, and closing argument transcripts for possible errors. The test is not to find and assert any possible error. Instead, appellate counsel is bound to assert errors that are meritorious and stronger than those actually asserted on direct appeal. Here, Marx has identified *no* particular claims within those transcripts that should have been asserted on direct appeal or that any such claim would have been successful or meritorious on appellate review.[125] He has not identified any error within those transcripts that was preserved for appellate review or that would have been stronger than those arguments addressed on appeal.

The only claim identified from the closing arguments transcript is the alleged prosecutorial misconduct claim during rebuttal argument. However, the challenge to the prosecutor's rebuttal argument is neither meritorious nor "stronger" than the claims asserted on direct appeal. Marx, therefore, can show no deficiency or prejudice resulting from his appellate counsel's assistance. *See Diaz*, 228 F. App'x. 427; *Smith*, 528 U.S. at 287-88.

Marx has failed to establish the denial of effective assistance of counsel on direct appeal under *Strickland* and its progeny. Had the state courts been given the opportunity to address this claim in a procedurally proper manner, the denial of relief would not have been contrary to or an unreasonable application of federal law.[126] Marx is not entitled to relief on this claim.

---

[125]As an aside, the Constitution does not automatically require state officials to provide an indigent defendant with a free, complete trial transcript and other records. *Kunkle v. Dretke*, 352 F.3d 980, 985-86 (5th Cir. 2003). The Fourteenth Amendment Due Process and Equal Protection Clauses only require states to provide indigent defendants with a trial transcript free of charge when it is necessary for meaningful appellate review. *See Griffin v. Illinois*, 351 U.S. 12, 19-20 (1956). The states are not required to furnish complete transcripts "so that the defendants . . . may conduct 'fishing expeditions' to seek out possible errors at trial." *Jackson v. Estelle*, 672 F.2d 505, 506 (5th Cir. 1982). Marx was not and would not now be entitled to free copies of the unrequested parts of the transcript to search for possible errors.

[126]*See* fn. 123, *supra*.

**VI.**    **Recommendation**

For the foregoing reasons, it is **RECOMMENDED** that Marx's petition for issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1430 (5th Cir. 1996).[127]

New Orleans, Louisiana, this 25th day of September, 2020.

_____
KAREN WELLS ROBY
**CHIEF UNITED STATES MAGISTRATE JUDGE**

---

[127]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.